CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHARLES EATON (Bar No. 325372)
(E-Mail: Charles_Eaton@fd.org)
Deputy Federal Public Defender
3801 University Avenue, Suite 700
Riverside, California  92501
Telephone:  (951) 276-6346
Facsimile:  (951) 276-6368

Attorneys for Defendant
SHARIEF DEONA MCDOWELL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. ED CR 22-00274-AB |
| Plaintiff, | |
| v. | **SHARIEF DEONA MCDOWELL'S MEMORANDUM RE: SENTENCING FACTORS; EXHIBITS** |
| SHARIEF DEONA MCDOWELL, | |
| Defendant. | |

Defendant Sharief Deona McDowell, through her counsel of record, Deputy Federal Public Defender Charles Eaton, hereby submits her position regarding sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  June 16, 2023          By  */s/ Charles Eaton*

CHARLES EATON
Deputy Federal Public Defender
Attorney for SHARIEF DEONA MCDOWELL

1

## I.    INTRODUCTION

"I have shamed my parents, siblings, friends, [and] especially my only son." - Sharief Deona McDowell ("Ms. McDowell"), Ex. B.

On December 13, 2022, Ms. McDowell pled guilty to Count One of the Information which charged her with wire fraud.  The Government became aware of Ms. McDowell's criminal activity in this case only because Ms. McDowell voluntarily disclosed what she had been doing in a series of letters sent to the Department of Justice and the FBI.  Ms. McDowell understood that she would be placing herself at the mercy of the Court, however, her guilty conscience would not be appeased until she owned up to her criminal conduct.  She has a deep desire to pay restitution to the people whom she has harmed, and has spent the last six months on pretrial release without any violations or concerns.  Due to her voluntary disclosure, excellent behavior on pretrial release, and advanced age, Ms. McDowell respectfully requests a sentence of three years of probation with a mandatory condition of three years of home detention.

## II.    THE APPROPRIATE SENTENCE

### A. 18 U.S.C. § 3553(a) Is The Applicable Standard of Review

The Supreme Court has ruled that the mandatory nature of the Sentencing Guidelines violates the Sixth Amendment.  United States v. Booker, 543 U.S. 220 (2005).  Consequently, the Sentencing Guidelines are now "effectively advisory." Id. at 245.  The Supreme Court has consistently held that federal judges should impose sentences that are not greater than necessary to satisfy the purposes of sentencing, consider all characteristics of the offender and circumstances of the offense, reject advisory guidelines that are not based on national sentencing data and empirical research, and serve the function in the constructive evolution of responsible guidelines. See id. at 245; Gall v. United States, 552 U.S. 38, 50 (2007); Kimbrough v. United States, 552 U.S. 85, 101 (2007); Spears v. United States, 555 U.S. 261, 263 (2009); Nelson v. United States, 555 U.S. 350, 351 (2009).

1    The applicable sentencing statutes provide that a sentencing court "shall impose
2    a sentence sufficient, but not greater than necessary" to achieve the objectives of
3    sentencing.  See 18 U.S.C. §§ 3553(a), 3582(a), and 3661.  In arriving at the
4    appropriate sentence, § 3553(a) directs sentencing courts to consider: the nature and
5    circumstances of the offense; the history and characteristics of the offender; the need to
6    reflect the seriousness of the offense, promote respect for the law, and to provide just
7    punishment for the offense; to afford adequate deterrence; to protect the public from
8    further crimes; to provide the defendant with need education, vocational training,
9    medical care, or other correctional treatment; and promote medical care, education, or
10   treatment in the most effective manner; the kinds of sentences that are available. 18
11   U.S.C. § 3553(a); Booker, 543 U.S. at 220.

### B. Guideline Calculations

13   Ms. McDowell concurs with the United States Probation Office's ("USPO" or
14   "Probation") calculations that her base level is 7 under U.S.S.G § 2B1.1(a)(1).  ("PSR,"
15   Dkt. No. 28 ¶ 32.)  Ms. McDowell concurs that she should receive a 16-level increase
16   due to the loss amount at issue in this case.  (Id. ¶ 36.)  Ms. McDowell concurs that she
17   should receive a two-level increase for the violation of a prior judicial order.  (Id. ¶ 43.)
18   Ms. McDowell concurs that she should receive a 3-level reduction due to her
19   acceptance of responsibility.  (Id. ¶¶ 49–50.)  However, Ms. McDowell's plea
20   agreement with the Government contemplated a two-level enhancement under U.S.S.G.
21   § 2B1.1(b)(2)(A) for involving more than 10 victims.  (Dkt. No. 7 ¶ 12); (Dkt. No. 35
22   at 5.)  Ms. McDowell seeks the benefit of her bargain, and the Government agrees that
23   this is appropriate.  (Dkt. No. 35 at 5.)  Therefore, Ms. McDowell believes that her total
24   level is 24.  (PSR ¶ 51.)  Ms. McDowell concurs with Probation that she is in criminal
25   history category III.  (Id. ¶ 60.)  Accordingly, Ms. McDowell agrees that her total range
26   is 63–78 months.  (Id. ¶ 109.)  However, for the reasons stated herein, Ms. McDowell
27   respectfully requests a sentence of three years of probation, with three years of home
28   confinement as a mandatory special condition of probation.

### C. Ms. McDowell's History and Characteristics

Sharief Deona McDowell, age 58, was born in San Bernardino, California to Emma Davenport ("Davenport") and Don Earl McDowell ("Earl McDowell"). (Id. ¶ 69.) Davenport, age 81, currently resides in Riverside, California and is a retired emergency medical technician. (Id.) Earl McDowell passed away from prostate cancer in 1990. (Id.) Ms. McDowell has two siblings from her parents union: Randall McDowell, age 59, and Damon McDowell, age 46. (Id. ¶ 70.) Both of them live in Los Angeles, California. (Id.) Additionally, Ms. McDowell has three half siblings, Alvin Oliver ("Oliver"), age 52, Teresa McDowell, age 47, and one other who she does not know. (Id. ¶¶ 71–72.)

Ms. McDowell's parents were never married, but the co-parented amicably. (Id. ¶ 74.) She spent most of her life living with her mother who was often busy with work or school, forcing Ms. McDowell to become independent at a very young age. (Id.) She was not supervised much and had very few rules enforced in the home. (Id.) Ms. Mcdowell was sexually abused and fondled by her stepfather, E. Oliver, and two of his nephews from the age of six through age ten or eleven. (Id. ¶ 75.) Unfortunately, the abuse was never addressed and charges were never filed. (Id.) When she was in her twenties, Ms. McDowell told her mother what had happened, and her mother confirmed that she had no idea that had been going on. (Id.) The relationship between E. Oliver and Davenport fell apart because E. Oliver eventually committed an act of domestic violence against Davenport when Ms. McDowell was a teenager. (Id.)

During Ms. McDowell's teenage years, there was a contentious custody battle between Davenport and E. Oliver over Oliver, who was one of their children and Ms. McDowell's half sibling. (Id. ¶ 77.) E. Oliver ended up kidnapping Oliver and beginning a custody battle without notifying Davenport. (Id.) Davenport lost custody of Oliver, who would cry during home visits about not wanting to return to E. Oliver's house. (Id.) This experience traumatized Ms. McDowell, who had a front-row seat to the pain that E. Oliver inflicted upon Davenport and Oliver. (Id.) After four years of

this, Oliver was eventually returned and allowed to live with Ms. McDowell and Davenport.  (Id.)

Ms. McDowell began a relationship with Robert Randolph ("Randolph") when she was 21 years old.  (Id. ¶ 79.)  They have one child together, Robert Randolph Jr. ("Randolph, Jr."), age 32, who resides in Moreno Valley, California.  (Id.)  Ms. McDowell and Randolph never married, and she is presently single.  (Id.)  Ms. McDowell currently provides full-time care for Davenport, who was diagnosed in 2019 with Alzheimer's disease, heart disease, kidney disease, and hydrocephalus.  (Id.)  Sadly, Davenport's health has recently declined and she requires diapers for urinary incontinence, and is unable to use the restroom on her own.  (Id.)  Due to her memory loss issues, she does not even know where the restroom is and must be consistently assisted.  (Id.)  Ms. McDowell provides nonstop supervision, and she receives very little help from any of her siblings.  (Id.)

Ms. McDowell has been completely drug free for over thirty years, and only drinks alcohol socially and without abusing it.  (Id. ¶ 93–95.)  Additionally, while this case has brought her feelings of depression and anxiety, she does not have a history of struggles with mental illness prior to this case.  (Id. ¶¶ 91–92.)

**D. Nature and Circumstances of the Offense; the Need to Reflect the Seriousness of the Offense; Just Punishment**

Ms. McDowell committed a serious offense and understands she caused tremendous pain to individual, hard-working people.  Ms. McDowell did not start her business intending to defraud people, however that is eventually what she ended up doing.  When she first took money that did not belong to her, she tried to earn the money back through investing so that she could repay her clients' accounts.  Ex. A at 3.  Her previous "success with trading led me to think I would be able to make it up and do the right thing, but Greed and Stupidity prevailed.  Biggest mistake and most embarrassing hurtful thing I have ever done."  Id.  She has severely harmed many people and will now have that weighing on her conscience for the rest of her life.

5

Eventually, Ms. McDowell's guilt over her conduct led her to contact federal authorities and voluntarily inform them of her wrongdoing <u>before any criminal investigation into her had been launched</u>.  Ex. A at 3; Exs. C–E.  Ms. McDowell, in an extraordinary showing of acceptance of responsibility, took ownership of her actions and saved the Government time and resources by freely and voluntarily confessing to her crimes before she faced the pressure of a criminal investigation.  Exs. C–E.  That same guilt has also caused her to ruthlessly center paying restitution back to the affected families above all else.  She intends to obtain a commission-based sales job and use her salary plus commission to satisfy the Court-ordered restitution payments.  Ex. B.  She also intends to trade stocks to generate supplemental income to help her pay down as much restitution as she can.  <u>Id.</u>

Ms. McDowell's behavior in this case is a manifestation of extraordinary acceptance of responsibility and provides the basis for a downward variance.  <u>U.S. v. Gardellini</u>, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (where defendant convicted of filing false income tax return and guidelines 10–16 months, district court properly imposed sentence of probation in part because defendant "cooperated with authorities and accepted responsibility . . . to an extraordinary degree."); <u>U.S. v. Milne</u>, 384 F.Supp.2d 1309, 1312 (E.D. Wis. 2005) (in bank fraud case, the advisory guidelines range of adjustment for acceptance and offense level of 18–24 months did not fully account for defendant's voluntary reporting of his misconduct to bank and his significant early efforts to repay bank); <u>U.S. v. DeMonte</u>, 25 F.3d 343, 349 (6th Cir. 1994) (in computer fraud case, departure proper on ground that defendant admitted to crimes about which government had no knowledge, even though part of plea bargain to cooperate-remanded).

Additionally, Ms. McDowell's voluntary disclosure of a crime and cessation of criminal activity before discovery also provides a basis for a downward departure.  <u>See</u> U.S.S.G. §5K2.16; <u>U.S. v. Jones</u>, 158 F.3d 492 (10th Cir. 1998) (where defendant pled guilty to possession of a firearm by a prohibited person, the district court did not abuse

its discretion in departing downward by three levels when it considered that the defendant voluntarily disclosed to the pretrial services officer false statements he made to obtain firearm even though would have been inevitably discovered by FBI); U.S. v. Numemacher, 362 F.3d 682 (10th Cir. 2004) (where defendant possessed and distributed child porn on his website for a short time but destroyed all porn before learning of the investigation and where he cooperated with the FBI, conduct "atypical" and justified a downward departure).

Ms. McDowell's excellent behavior while on pretrial release is a precursor to how she would act if given a sentence of probation.  She has been on pretrial release for over six months without any violations of concerns, and has been extremely communicative with her counsel as well as with her probation officer.  U.S. v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008) (in drug case where guidelines 47–56 months, district court's sentence of one year and day in prison and one year home detention reasonable in part because of defendant's "behavior while on a year-and-a-half pretrial release, which the district court found to be exemplary," which shows defendant unlikely to reoffend); U.S. v. Baker, 502 F.3d 465 (6th Cir. 2007) (where defendant pled guilty to possession of unregistered firearm arising from altercation with wife during which gun accidentally discharged and guideline range 27–33 months, below-guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services).

Furthermore, this case represents Ms. McDowell's first felony conviction.  The ruin of her professional reputation as well as the stigma of receiving a felony conviction at her advanced age has caused her considerable psychological pain and should be considered as a reason to vary downward.  See U.S. v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (in securities fraud where guidelines called for life, court imposes 42 months noting that factor of specific deterrence accounted for because, "With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); U.S. v. Smith, 683 F.2d 1236, 1240 (9th Cir.

1    1982) ("The stigma of a felony conviction is permanent and pervasive."); Wayne A.

2    Logan, "Informal Collateral Consequences" 88 Washington Law Review 1103 (2013)

3    ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn

4    reputation beyond the grave."); id. at p. 1107 ("[S]tigma can have a self-fulfilling

5    criminogenic effect, predisposing individuals to become the deviants they were branded

6    to be."); Ernest Drucker, *A Plague of Prisons* (The New Press 2011), at p. 130

7    ("Having served their formal sentences, ex-prisoners will endure new forms of

8    punishment capable of generating more anger, more shame, and the scars of permanent

9    social stigma . . . most states . . . bar many ex-felons from living in public housing,

10   from working in a wide variety of jobs and professions, and from receiving a range of

11   forms of public assistance including school subsides, income support and food

12   stamps.").

13        Additionally, a lengthy sentence of incarceration is not necessary to deter Ms.

14   McDowell from reoffending.  Restitution in the amount called for in this case will

15   likely require Ms. McDowell to spend the rest of her paying this money back.  See U.S.

16   v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (in securities fraud case where

17   guidelines call for life, court imposed a sentence of 42 months and $50 million in

18   restitution, which "virtually guarantees that Adelson will be making substantial

19   restitution payments for the rest of his life.  So far as monetary sanctions are concerned,

20   therefore, the Court did indeed impose a life sentence.").

21        Furthermore, the theory of general deterrence is that imposing a penalty on one

22   person will demonstrate to others the costs of committing a crime, thus discouraging

23   criminal behavior.  Research, however, has consistently shown that while the certainty

24   of being caught and punished has a deterrent effect, "increases in severity of

25   punishments do not yield significant (if any) marginal deterrent effects."  Michael

26   Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28-29 (2006).

27   "Three National Academy of Science panels . . . reached that conclusion, as has every

28   major survey of the evidence."  Id.; see also Zvi D. Gabbay, Exploring the Limits of the

Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research, Hart Publishing, Oxford (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE. PDF.  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  Id. at 1.  It examined the effects of changes to both the certainty and severity of punishment.  Id.  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . we're not sufficient to achieve statistical significance."  Id. at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  Id. at 1; see also United States v. Lawrence, No. 16-CR 243, 254 F.Supp. 3d 441, 444 at 9 (E.D.N.Y. June 6, 2017) (expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy costs of punishment.").

The reason for this is that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and do not consider sentence consequences in the manner one might expect of rational decision makers.  See Tonry, Purposes and Functions of Sentencing, supra, at 28–29. Even the DOJ concedes that "a short prison sentences is just as likely to deter [defendants] from future offending as a long prison sentence."  United States v. Diaz, No. 11-CR-821-2, 2013 WL 322243 at *76 (E.D.N.Y. Jan. 28, 2013).

### III.   CONCLUSION

Due to her advanced age, voluntary disclosure of criminal activity, and behavior while on pretrial release, Ms. McDowell is very unlikely to reoffend and now poses no

danger to the public.  Accordingly, Ms. McDowell respectfully requests a sentence of three years of probation, with a mandatory term of three years of home detention.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  June 16, 2023            By  /s/ Charles Eaton

Charles Eaton
Deputy Federal Public Defender
Attorney for SHARIEF DEONA MCDOWELL

**PROOF OF SERVICE**

I, **Kimberly Lopez**, declare that I am a resident or employed in Riverside County, California; that my business address is the Office of the Federal Public Defender, 3801 University Avenue, Suite 700, Riverside, California  92501, (951)  276-6346; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **SHARIEF DEONA MCDOWELL'S MEMORANDUM RE: SENTENCING FACTORS; EXHIBITS** on the following individual(s) by:

| [] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ X ] via E-Mail addressed as follows: |
|---|---|---|---|

**Jacqueline Lira**
**USPO**
**Jacqueline_Lira@cacp.uscourts.gov**

This proof of service is executed at Riverside, California, on **June 16, 2023.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____.
**KIMBERLY LOPEZ**

11